### THE SONARD.

### THE MATTON NO. 20.

### THE C. M. C. NOS. 10, 20, 30 AND 40.

### THE RALPH E. MATTON.

Petition of JOHN E. MATTON & SON, Inc.

Nos. A—15883, A—15907.

District Court, E. D. New York.

Feb. 13, 1941.

On Reargument March 18, 1941.

Purdy & Lamb, of New York City (Edmund F. Lamb, of New York City, of counsel), for John E. Matton & Son, Inc., and Conners Marine Co., Inc.

Mahar & Mason, of New York City (Frank C. Mason, of New York City, of counsel), for Bouchard Transp. Co., Inc.

Foley & Martin, of New York City (Christopher E. Heckman, of New York City, of counsel), for claimant-impleaded.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for damage-claimant Frontier Fuel Oil Corporation.

Bronner & Ward, of Little Falls, N. Y. (Leo F. Hanan, of New York City, of counsel), for damage claimants Mohawk Valley Paper Co., Inc., and Burrows Paper Corporation.

BYERS, District Judge.

It becomes necessary in these causes to decide whether one or more of the eastbound barges in tow of the tug Matton No. 20 struck the westbound barge Sonard being pushed by the tug Ralph E. Matton, so

as to cause that barge to sustain underwater damage to her hull, on November 7, 1939, at about 4:45 a.m., when both tows were off Seeley Island (near Little Falls) about 2,000 feet west of Lock 17 in the New York State Barge Canal.

It is undisputed that shortly after the Sonard had proceeded on her westward way beyond Seeley Island, she was discovered to be making water so rapidly that she was beached, first at 6:05 a.m. immediately east of Lock 18, and that proving to be an untenable position, she was shoved west of the lock at around 9 a.m., and was beached on the southerly side of the Canal. Cargo, hull, and consequential damages, arising from these happenings, brought about these sundry litigations.

In the first cause, the Bouchard Transportation Co., Inc., the owner of the Sonard, sued the tug Matton No. 20, and her four barges. The owner of the barges (Conners Marine Co., Inc.) answered, and also impleaded the tug Ralph E. Matton (pushing the Sonard westbound) as being solely responsible for the damage asserted in the libel.

To that petition, the owner of the impleaded tug, having claimed her, made answer to both the libel and the impleading petition.

In the second cause, the owner of the tug Matton No. 20 petitions for limitation and exoneration. It appears that, in addition to the cause asserted in the libel in the first cause, claims for consequential damages have been made against the owner of the Sonard because the cargo laden upon her (bunker oil) flowed upon property adjoining the place at which she was finally beached.

It will be seen that the central issue in these causes, which were tried together by consent, is whether the Sonard did in fact suffer hull damage as the result of being struck by one or more of the barges in the eastbound tow.

As to the Matton No. 20, her right to limit is not in issue.

Upon conflicting evidence, it is deemed that the proof establishes:

(a) The steel barge Sonard, fully laden, being pushed by the tug Ralph E. Matton westbound, on November 7, 1939, entered that portion of the Barge Canal which lies north of Seeley Island, at about 4:30 a.m. while it was yet dark, under an extra slow bell, i. e., at less than one mile an hour.

(b) The eastbound tow, comprising the Matton No. 20 and four steel barges, was then lying moored to the northerly wall opposite Seeley Island, in obedience to a red-light signal displayed to the east of that place, by the Canal authorities—to indicate that a westbound tow had cleared Lock 17.

(c) The navigable channel was 94 feet, measured on the surface of the water, but by reason of the rock formation on the southerly side, laden vessels were required to clear Seeley Island by about 8 to 10 feet to avoid possible contact with rocks and large stones which might have fallen from that side into the Canal.

(d) The eastbound tow was about 540 feet long, the tug Matton No. 20 being 67.8 feet long by 20 feet in beam, separated by 12 feet from the hawser barge; the three following barges being close coupled. All four barges were 114 feet long by 36 feet, and all were fully laden.

(e) The westbound tow was about 280 feet long, the Sonard being 200 feet long by 36 feet, and the Ralph E. Matton being 81 feet long by 20.8 feet.

(f) Seeley Island is about 380 feet long.

(g) It was required of the eastbound tow to remain moored at the north wall until the westbound tow had passed clear. This was the custom, as well as the plain necessity of the situation.

(h) The eastbound tow was held to the north wall, when the two tugs were abreast, by a bow line from the tug to the wall, and by two lines from the first barge, and two from the fourth. There was none from the second, and it is not demonstrated that there was any from the third.

(i) The Matton No. 20 caused the said holding lines to be let go before the westbound tow had cleared the eastbound tow, and at a time when the engines of the former's tug had been stopped and the tow was barely moving.

(j) The Matton No. 20 then started her tow eastbound, away from the northerly wall, before the westbound tow had cleared the eastbound tow, and while it was almost, if not quite, still in the water.

(k) Two or three of the barges in tow of the Matton No. 20 moved ahead and sagged off the wall to their own starboard, and came into contact with the Sonard with

such force as to shove her over to her own port, and cause her to strike on the Seeley Island side, whereby a hole was stove in her bottom at about 77 feet aft of her bow and about 1 foot in from her port side. That hole caused her to leak in such volume that she had to be stranded to avoid sinking.

(l) The hole so stove in the bottom of the Sonard was the cause of the damage sustained by the Sonard and her cargo.

(m) The said damage to the Sonard was not caused by any act or omission on the part of the tug Ralph E. Matton. The stopping of her engines, above-referred to, was the result of apprehension by her navigator, that the eastbound barges were sagging over into his course, but their expectable movements were not clear, even though the searchlight on this tug was being used.

 It is concluded therefore that, in the first cause, the libelant is entitled to a decree, with costs, against the claimant of the vessels against whom process issued, and the impleaded tug is entitled to a decree, with costs, dismissing the petition against her.

In the second cause, the petitioner is entitled to limitation, and the prayer for exoneration is denied.

The foregoing do not invite extended discussion; either the narrative of the libelant's witnesses is accepted or it is not. The reasons why it is deemed to be persuasive may be briefly stated:

The Sonard had been in drydock on November 4, 1939, to receive repairs, and the evidence that she was seaworthy, i. e., fit to perform the undertakings of this voyage, is not impaired by the argumentative conjectures relied upon to the contrary.

She safely carried her cargo up the Hudson, and through so much of the Canal as she had covered on this trip, without incident, and without developing a list.

The eyewitnesses called for her described the striking by the barges and its results, in such a way as to persuade the court of the essential truth of their testimony. That there was a striking is shown by the testimony of the captain of the fourth barge of the other tow, although he describes it as a light contact with the tug Ralph E. Matton, rather than the Sonard, and before the lines of his tow had been let go.

There could have been no such occurrence, had the eastbound tow remained at the wall, unless indeed the westbound tow was headed into the other. Had that been the case, the damage would have been done to the latter, which no one asserts.

The testimony for the Matton No. 20 is contradictory as to the time when the latter signaled to the bargees to let go their lines; the navigator of the tug says that he watched the other tow clear his last barge before blowing the let-go signal; the bargee of the second barge, who was on the wall to let go the lines, says the signal was given when the westbound tow had covered half of the other. They cannot both be right.

The latter witness says that, when he let go the lines of the fourth barge, she was close enough to his position on the wall for him to jump aboard, but instead of doing that he chose to walk down to Lock 17, nearly half a mile to the east—during the 5 o'clock darkness of a November morning—although he had already been walking back and forth on the wall for the entire hour that his tow lay there.

So much of his testimony is less than convincing. It suggests too much protesting to establish close proximity to the wall by the fourth barge at the critical time.

The opinion is presently held that the Matton No. 20 moved ahead too soon, probably from an impatience that is easy to understand, but not legally to be condoned, since the margin of safety between these heavily laden tows was too slender (8 or 10 feet at most) to admit of less than a meticulous discharge of those duties of the eastbound tow, which clearly pertained to the navigator of the tug, and to the men who were handling the lines on the barges.

 It is necessary to account for the hole that was stove in the bottom of the Sonard; no other explanation is apparent than that recounted by the witnesses called by the libelant in the first cause, nor is one seen to be lurking in the evidence as a whole. Truly the burden lay with the affirmative side, but the flaws in that presentation which are urged for the Matton No. 20 afford but feeble nourishment to sustained skepticism.

 At the close of the trial, I expressed a misgiving over the conceded failure of the Ralph E. Matton to blow an alarm when the peril to the Sonard from the other barges became imminent. That view persists, but it does not discredit the libelant's cause. If there were any proof to justify a finding that an alarm would probably have avoided the collision, the basis would exist for con-

cluding that the Ralph E. Matton was also at fault. That is not seen to be the case, however, once it is realized that, as to the third and fourth barges, the lines had been let go, and as those barges had but to sag over a mere matter of 8 to 10 feet, the alarm, if blown, could not have brought about, even with co-operation from the Matton No. 20, the replacing of lines on the north wall, and thus the means to haul those barges back into the positions which they left prematurely, in time to avoid their exerting sufficient force against the Sonard to push her over far enough to her own port to cause the damage which has been shown.

Settle decrees.

### On Reargument.

This is a motion for "reargument and reconsideration" of the decision dated February 13, 1941, on behalf of the petitioners in the limitation (the second) cause, for the reason that a decree should not have been ordered against the barges as well as the tug. This, because of the well-known rule that the navigation and make-up of a tow are in the control of the tug.

But in this case neither of those things was involved.

This tow was moored to the wall, as the decision relates, during the hours of darkness, and the let-go whistle blown by the tug was premature, if at once obeyed. It was obvious to the bargee of the second barge, who was on the wall to handle lines, that as to the fourth barge, at least, the mooring could not be released without danger to the westbound tow until the latter should have cleared the fourth barge at the wall. It must have been equally obvious to the bargee on the latter vessel; therefore the let-go whistle did not exonerate them of some responsibility for the exercise of intelligence in the handling of lines, where blind obedience threatened peril; the tug could not move ahead until their co-operation rendered that possible; they knew the signal from the tug was blown from better than 400 feet ahead of the last barge, and that the tug's navigator could not see whether clearance had been accomplished, because of the prevailing darkness. It seems to me that the whistle signal, under these circumstances, was not peremptory, but was intended to direct that the lines be cast loose as soon as that should be safe, and that for failure so to co-operate, the barges participated in the fault which caused the damage.

Correction of this judicial error, if such it be, need not be long delayed.

The decree should go as the decision indicates.

So far as consequential damage is concerned, the intention was to leave that matter so that claimants could elect whether to proceed in the State Courts or before the Commissioner; naturally it was not intended that their claims should be twice litigated.